**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

DONALD PEVIA,                          *

Petitioner,                            *

v.                                     *          Civil Action No. ELH-16-1223

WARDEN FRANK BISHOP and                *
THE ATTORNEY GENERAL OF THE
STATE OF MARYLAND,                     *

Respondents.                           *
                                     ***

## MEMORANDUM OPINION

Donald Pevia, a Maryland prisoner, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging his 2011 conviction in the Circuit Court for Carroll County, Maryland for second-degree murder of an eight-month-old child; first-degree child abuse resulting in death; and related offenses. ECF 1. Pevia, who is self-represented, also filed exhibits, docketed collectively at ECF 1-1.

Pevia presents numerous contentions. In sum, he contends that the evidence was legally insufficient to support his convictions; his attorneys rendered ineffective assistance; and the State trial court, the State appellate court, and the State post-conviction court committed a host of errors. *See* ECF 1.

Respondents, Warden Frank Bishop and the Maryland Attorney General, filed an Answer (ECF 8), along with numerous exhibits. In their view, Pevia has not presented any basis for relief under 28 U.S.C. § 2254(d). Pevia replied (ECF 9), and was given an additional opportunity to supplement his response (ECF 13), which he did on April 9, 2018. ECF 14. On November 13,

2018, Pevia filed a Motion to Supplement and Amend Complaint. ECF 15. The motion shall be granted.[1]

I shall refer to ECF 1, ECF 14, and ECF 15 collectively as the "Petition." No hearing is necessary to resolve the Petition. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6 (D. Md. 2018); *see also Fisher v. Lee*, 215 F. 3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. §2254(e)(2)).

For the reasons that follow, I shall deny the Petition. A certificate of appealability shall not issue.

## I.      Factual and Procedural History

At the outset of the trial in the Circuit Court for Carroll County, defense counsel advised Pevia of his right to a jury trial and the nature of a jury trial. ECF 8-2 at 6-7.[2] Pevia elected to waive his right to a jury trial, and the trial judge "note[d] the waiver . . . ." *Id.* at 7. As a result, Pevia was tried by the court, without a jury, on March 28-April 1, 2011. *See* ECF 8-1 at 6-7; ECF 8-2 to 8-6. Judge J. Barry Hughes presided.

The facts at Pevia's trial were summarized by the Maryland Court of Special Appeals, *Pevia v. State*, No. 1132, Sept. Term 2011 (filed July 1, 2013) (unpublished), as follows, ECF 8-11 at 3-8:

> On June 30, 2008, Ky'leigh Rogers was born to Angela Mabe and Charles Rogers, who were not married.[1] At the time of her birth, she and her parents lived together at Angela's grandparents' house in Sykesville, Maryland. A month later, Rogers moved out and Angela started dating appellant [Pevia]. In December 2008, Angela and Ky'leigh moved from Angela's grandparent's house to appellant's mother's house. In January 2009, however, appellant, Angela, and Ky'leigh

---

[1] Pursuant to 28 U.S.C. § 2254, an application for a writ of habeas corpus may be amended or supplemented as provided in the rules of procedure applicable to civil actions. In turn, Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that the court should freely give leave to amend when justice so requires.

[2] William Welch, Esquire represented Pevia at trial.

returned to Angela's grandparents' house. This is where Ky'leigh lived until her death.

The living arrangements in the home were that Ky'leigh, Angela, and appellant lived in the basement of the house. Angela's twin sister, Dakota Mabe, had a bedroom on the first floor where she lived with her boyfriend, Rodney Harris, and her four-year-old daughter. The grandmother, who was physically limited and could not go up or down stairs, also had a bedroom on the first floor; the grandfather's bedroom was on the second floor. Eight months after her birth, on March 3, 2009, Ky'leigh died.

By all accounts, Ky'leigh was generally a happy, healthy baby until a few weeks before her death. Dr. Jennifer Kottra, Ky'leigh's pediatrician since she was born, testified that Angela brought Ky'leigh in for all well-child visits and vaccinations and that her development was on track. On February 9, three weeks before Ky'leigh's death, Angela brought Ky'leigh in to see Dr. Kottra because Ky'leigh was congested and was running a fever. During the visit, Dr. Kottra noted some tiny red dots on Ky'leigh's face, but she saw no bruising. Dr. Kottra explained that the dots could have been caused by a virus or by smothering, strangulation, or shaking. She asked Angela if anyone could be shaking Ky'leigh, and Angela replied that she did not think so. Nonetheless, Dr. Kottra sent Angela to an ophthalmologist to check for retinal hemorrhages to rule out child abuse. The subsequent tests were negative. The pediatrician saw Ky'leigh for a follow up visit ten days later on February19. Ky'leigh had no fever, her congestion was much improved, and the red dots had faded. The pediatrician testified that Ky'leigh was "active and alert and playful" during the visit, and she again saw no bruising.

The week before Ky'leigh died, Angela testified that she took her to two different hospitals. Angela explained that Ky'leigh had extreme sensitivity on her left side and Angela heard "popping" or "clicking" sounds from that side. Angela admitted that she lied to the medical personnel on both occasions, telling them that Ky'leigh had fallen off a bed, which was untrue. She testified that she feared Ky'leigh was being abused and was scared that Child Protective Services might take her daughter away from her.

At the first hospital, appellant refused to get out of the car. After Ky'leigh was checked in, he and Angela began arguing, and appellant demanded that they leave. The argument escalated. While out by the car, appellant grabbed Angela around the throat, which he had done "a few times" before and yelled that they were leaving "because he wasn't going back to jail[.]" They then left without Ky'leigh being seen by any medical staff. Angela admitted that in January she and appellant began "arguing a lot" about money, appellant's heroin addiction, and his stealing her money to buy drugs. Appellant did not work, and most days Angela drove him to Baltimore where he purchased heroin for his drug addiction.

The weekend before Ky'leigh died, Angela's mother, Susan Sharpe, watched Ky'leigh. She noticed scrapes and bruises on Ky'leigh's face and chin, and that she flinched when picked up. Ms. Sharpe also noticed bruises on Ky'leigh's feet and ribs, and fingerprints on her thighs. Although Ky'leigh sat up and played some during the visit, Ms. Sharpe thought Ky'leigh was in pain. When she returned Ky'leigh to Angela, Ms. Sharpe expressed her concern and suggested that she and Ky'leigh move in with her. That did not happen.

Around 9:30 a.m. on the day of Ky'leigh's death, Angela asked Dakota, who was several months pregnant, to watch Ky'leigh. Angela then took appellant to Baltimore so he could buy heroin. Dakota, her daughter, and Harris, as well as the grandmother, were at the house. According to Dakota, Ky'leigh seemed fine— she was sitting on the bed, smiling, and watching Harris play hand puppets with her. Around 11:00 a.m., Dakota heard the door slam and then Angela and appellant arguing in the basement. A few minutes later, Angela came upstairs and asked Dakota to keep an eye on appellant, who she said had threatened to commit suicide. Dakota was not overly concerned about this information, believing that it was just appellant's way of getting Angela's attention. Before leaving, Angela observed Ky'leigh smiling, sitting up on the bed with Dakota caring for her. Shortly thereafter, Harris also left. Ky'leigh took a nap.

Around 12:30 p.m., appellant came upstairs and said he was taking Ky'leigh downstairs. He took Ky'leigh, who began to cry loudly, and her bottle and her walker and headed downstairs. Dakota called Angela to make sure it was all right if appellant had Ky'leigh; Angela said it was okay. Less than two hours later, around 2:15 p.m., appellant brought Ky'leigh upstairs and handed her to Dakota. Ky'leigh was limp, she did not move, her eyes were barely open, and she was breathing heavily. Appellant said he did not know what was wrong with her and then walked out of the room. Dakota immediately called 911.

Paramedics arrived at 2:30 p.m. and found Ky'leigh very lethargic and in respiratory distress. She was immediately taken to the hospital where she went into cardiac arrest. At the hospital and while awaiting news about Ky'leigh, appellant told Angela's and Dakota's younger sister that while in the basement, he dozed while Ky'leigh was in her walker. At some point, Ky'leigh started crying, and he got up. He fed her a bottle on the bed and "she just looked like she went into a daze and wasn't breathing right." Similarly, appellant told Dakota at the hospital that Ky'leigh was sitting in her walker when "she started acting funny."

After about 90 minutes of emergency resuscitation, Ky'leigh was pronounced dead. An autopsy was done the following day. Dr. Russell Alexander, the medical examiner, testified that although it was very unusual for an eight-month-old to have any bruises at all, Ky'leigh had 42 bruises on her body, 13 of them about her head. Additionally, she had skull fractures on both sides of her head, six recent rib fractures, and 16 older rib fractures. He opined that the older rib fractures could have occurred between two to five weeks before her death. Also,

Ky'leigh's liver and spleen were torn, which he explained would have resulted in significant internal bleeding. She had bruised lungs caused by a blow or squeeze to the chest and tearing inside both her upper and lower lips. He explained that the blows causing the head injuries, the internal injuries, and the rib fractures were of "significant force." The injuries, however, were not due to the efforts by the hospital medical personnel to save her life. He added that the severity of the injuries observed on Ky'leigh are seen in cases of child abuse, from "a high speed car wreck, [or] falling from a . . . four or five story window[.]"

Dr. Alexander testified that Ky'leigh's death was due to all her injuries but some were more significant and "rapidly life threatening." The rapidly life threatening injuries included the torn spleen on one side of her abdominal cavity and her torn liver on the other that caused internal bleeding; the broken ribs to both sides of her chest that would have made it difficult to breathe, and the blows to the head that fractured the skull on both sides. He testified that the injuries could have been inflicted at the "extreme" outside estimate of 12 hours before her death but were "more likely" inflicted within "minutes to an hour or so" before her death. He added that a child with her injuries "would not have been acting in a normal way" because of the pain and that the injuries to the liver and spleen would have resulted in an "immediate[] . . . change in behavior[.]" He added that the "constellation of injuries" had an "asphyxia component[.]" Specifically, he noted the torn upper and lower lips, bruising on the neck, and spots on the left eye. He testified that someone could have smothered her or placed their hand over her mouth and nose, and such asphyxiation "could render that person unconscious very, very rapidly[.]"

After both parties had presented their evidence and arguments, the trial court made more than 15 pages of findings of fact. The court stated that it could not credit much of Angela's testimony due to her admitted lies to hospital personnel when seeking medical treatment for Ky'leigh the week prior to her death. The court found Dakota's testimony credible, noting that she loved Ky'leigh "very much and would not have harmed her." The court found that between 11:00 a.m. and 12:30 p.m., Ky'leigh was in Dakota's care, sitting up and acting normally. Between 12:30 p.m. and 2:15 p.m., while in appellant's sole care, her physical condition rapidly deteriorated. Based on the evidence presented, the trial court found that Ky'leigh's fatal injuries occurred during this time.

Thereafter, on April 20, 2011, Pevia was found guilty of second-degree murder, first-degree child abuse resulting in death, and related offenses. *See* ECF 8-1 at 8; ECF 8-14 at 2, ¶ 4. On July 5, 2011, he was sentenced to a total of 60 years in prison. ECF 8-1 at 8-9.

Pevia appealed his conviction to the Maryland Court of Special Appeals, presenting a single question for review: "Is the evidence sufficient to establish Mr. Pevia's guilt beyond a

reasonable doubt?" ECF 8-9 (Appellant's Brief) at 4.[3] In an unreported opinion filed on July 1, 2013, the Maryland Court of Special Appeals affirmed Pevia's convictions. ECF 8-11, *Pevia v. State*, No. 1132, Sept. Term 2011 (July 1, 2013).

Pevia then filed a petition for writ of certiorari to the Maryland Court of Appeals. ECF 8-12 at 1-10. That court denied the petition on October 21, 2013. *Id.* at 11. Pevia did not seek further review in the United States Supreme Court.

In the interim, on August 23, 2013, in the Circuit Court for Carroll County, Pevia filed a pro se petition for post-conviction relief. *See* ECF 8-13. He also filed a supplemental petition, through counsel, on October 22, 2014. ECF 8-14.[4]

As supplemented, litigated, and construed, the petition alleged that: (A) trial counsel was ineffective for (1) failing to impeach Rodney Harris, (2) failing to impeach Angela Mabe, (3) failing to exclude prior "bad acts" evidence, (4) failing to challenge the trial court's noncompliance with Maryland Rule 4-246, (5) failing to file a motion for modification of sentence, and (6) based on the cumulative effect of these errors; (B) appellate counsel was ineffective for failing to challenge the trial court's noncompliance with Maryland Rule 4-246; and (C) the trial court failed to comply with Maryland Rule 4-246 when accepting Pevia's jury trial waiver. *See* ECF 8-13; ECF 8-14; ECF 8-15.

The State court (Daniels, J.) held a hearing on the post-conviction petition on December 10, 2014. *See* ECF 8-1; ECF 15. The post-conviction court issued a Memorandum Opinion and

---

[3] On appeal, Pevia was represented by Marc DeSimone, Jr., Assistant Public Defender, the Office of the Maryland Public Defender, Appellate Division.

[4] James Nichols, an Assistant Public Defender, represented Pevia, pursuant to Maryland's Uniform Postconviction Procedure Act, Md. Code, §§ 7-101 et seq. of the Criminal Procedure Article. *See also* Md. Rule 4-401.

Order on July 2, 2015.  ECF 8-1; ECF 8-15.  It granted Pevia the right to file a belated motion for reconsideration of sentence but otherwise denying his petition for post-conviction relief.  *Id.*

On August 5, 2015, Pevia filed an application in the Maryland Court of Special Appeals, for leave to appeal the denial of post-conviction relief.  ECF 8-16.  He presented only two contentions.[5]  First, he alleged that the post-conviction court erred in concluding that trial counsel was not ineffective for failing to challenge the trial court's noncompliance with Maryland Rule 4-246.  *Id.* at 1.  Second, he claimed that the post-conviction court erroneously determined that evidence of defendant's prior "bad acts" did not "taint" the verdict.  *Id.* at 2.  On March 8, 2016, the appellate court denied Pevia's application; the mandate issued on April 8, 2016.  ECF 8-17.

On April 23, 2016, Pevia filed his Petition in this court.  ECF 1.[6]  He claims that there was "inadequate evidence" to support his guilty verdict, and thus the Maryland Court of Special Appeals erred in affirming his judgment of conviction and the post-conviction court erred in denying relief.  *Id.* at 18-19.  In addition, Pevia contends that the post-conviction court erred in failing to find that trial counsel rendered ineffective assistance.  *Id.* at 19.  Specifically, Pevia claims that counsel failed "to submit evidence at trial, alert [the trial judge] of Mr. Harris [sic] perjured testimony, properly cross examin[e] Angela Mabe of perjured testimony," and adequately inform the trial judge "to comply with Md. Rule 4-246."  *Id.*

On November 13, 2018, Pevia filed a "Motion To Supplement And Amend Complaint." ECF 15.  He seeks to present an additional question: "Did [the trial judge] error [sic] when he failed to note Petitioner's waiver of jury trial was [made] knowingly and willingly?"  *Id.* at 1.

---

[5] It does not appear that Pevia was represented at that time.

[6] Although the Court received Pevia's Petition on April 25, 2016, his Petition is deemed filed as of the date he mailed it.  *See Houston v. Lack*, 487 U.S. 266, 276 (1988) (holding that a prisoner's submission is deemed to have been filed on the date it was deposited in the prison mailing system); *see also* ECF 1-2.

Relying on the Maryland Court of Appeals' decision in *Valonis v. State*, 431 Md. 551, 66 A.3d 661 (2013), Pevia argues that the trial court violated Maryland Rule 4-246, because it failed to find that Pevia knowingly and voluntarily waived his right to a jury trial. *Id.*

## II.  Standard of Review

In order for Pevia to pursue federal habeas review, he must have exhausted his right to relief in State court. 28 U.S.C. § 2254(b)(1); *Rose v. Lundy*, 455 U.S. 509, 510 (1982). In Maryland, a claim may be exhausted either on direct appeal or in post-conviction proceedings.

To exhaust a claim on direct appeal in non-capital cases, a defendant must assert the claim in an appeal to the Maryland Court of Special Appeals and then to the Maryland Court of Appeals by way of a petition for a writ of certiorari. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (stating that exhaustion requirement is satisfied by "giv[ing] the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process"); Md. Code, §§ 12-201, 12-301 of the Courts and Judicial Proceedings Article ("C.J."). To exhaust a claim through post-conviction proceedings, it must be raised in a petition filed in the circuit court and in an application for leave to appeal to the Maryland Court of Special Appeals. *See id.*; Md. Code, § 7-109 of the Criminal Procedure Article ("C.P."). If the Court of Special Appeals denies the application, then no further review is available and the claim is exhausted. C.J. § 12-202.

As a further precondition to federal habeas review, a properly presented and exhausted claim must not be procedurally defaulted. Procedural default occurs when the petitioner failed to present the claim to the highest state court with jurisdiction to hear it, and the state courts would now find that the petitioner cannot assert that claim. *Mickens v. Taylor*, 240 F.3d 348, 356 (4th Cir. 2001); *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998).

Thus, any failure to raise a claim on direct appeal constitutes a procedural default that bars presentation of the claim, unless the petitioner can demonstrate "cause and actual prejudice resulting from the errors of which he complains," or "actual innocence." *United States v. Pettiford*, 612 F.3d 270, 280 (4th Cir. 2010) (citing *United States v. Mikalajunas*, 186 F.3d 490, 492-93 (4th Cir. 1999)); *see Bousley v. United States*, 523 U.S. 614, 621 (1998) ("Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal.") (internal quotations and citations omitted); *see also Dretke v. Haley*, 541 U.S. 386, 393 (2004); *Reed v. Farley*, 512 U.S. 339, 354 (1994) (stating that where the petitioner "failed properly to raise his claim on direct review, the writ is available only if the petitioner establishes 'cause' for the waiver and shows 'actual prejudice resulting from the alleged . . . violation.'") (citation omitted); *Murray v. Carrier*, 477 U.S. 478, 485 (1986).[7]  Procedural default also occurs where a state court declines to consider the merits of a claim on the basis of an adequate and independent state procedural rule. *Yeatts v. Angelone*, 166 F.3d 255, 260 (4th Cir. 1999); *see also Gray v. Zook*, 806 F.3d 783, 798 (4th Cir. 2015) ("When a petitioner fails to comply with state procedural rules and a state court dismisses a claim on those grounds, the claim is procedurally defaulted.").

To overcome a procedural default, the petitioner must demonstrate cause and prejudice, or show that a failure to review the claim will result in a fundamental miscarriage of justice. *Gray*, 806 F.3d at 798.  Under the "cause and prejudice" standard, the petitioner must show: (1) cause for not raising the claim of error on direct appeal; and (2) actual prejudice from the alleged error.

---

[7] Because of similarities between 28 U.S.C. § 2254 and § 2255, I sometimes cite to cases under § 2255.  Generally, in the context of a claim under 28 U.S.C. § 2255, failure to raise on direct appeal a claim of ineffective assistance of counsel is not regarded as procedurally defaulted. *Massaro v. United States*, 538 U.S. 500, 509 (2003).

*Bousley*, 523 U.S. at 622; *see also Dretke*, 541 U.S. at 393; *Reed*, 512 U.S. at 354; *Frady*, 456 U.S. at 167-68.

In order to show cause for failure to raise a claim of error on direct appeal, a petitioner must prove that "some objective factor external to the defense such as the novelty of the claim or a denial of effective assistance of counsel" impeded efforts to raise the issue earlier. *Coleman v. Thompson*, 501 U.S. 722, 753 (1991); *see also Carrier*, 477 U.S. at 492 ("[C]ause . . . requires a showing of some external impediment preventing counsel from constructing or raising the claim."); *Mikalajunas*, 186 F.3d at 493 (movant must demonstrate "something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel"). Additionally, the alleged error cannot simply create "a *possibility* of prejudice," but must be proven to work to the petitioner's "*actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170 (emphasis in original). Put another way, prejudice does not support relief from a procedural default, in the absence of a showing of cause. *Carrier*, 477 U.S. at 494; *Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982).

Of import here, this court may grant a petition for a writ of habeas corpus only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a); *see Wilson v. Corcoran*, 562 U.S. 1, 1 (2010); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). In *Larry v. Branker*, 552 F.3d 356, 368 (4th Cir. 2009), the Court said: "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."

"The role of a federal habeas court is to guard against extreme malfunctions in the state criminal justice systems, not to apply de novo review of factual findings and to substitute its own

opinions for the determinations made on the scene by the trial judge." *Davis v. Ayala*, ___ U.S.

___, 135 S. Ct. 2187, 2022 (2015) (internal marks and citations omitted). In *Nicolas v. Atty. Gen.

of Maryland*, 820 F.3d 124, 129 (4th Cir. 2016), the Fourth Circuit explained:

> The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) requires a federal court reviewing a habeas petition that has already been adjudicated on the merits in state court [to] give considerable deference to the state court decision. A federal court may not grant habeas relief unless the state court arrived at 'a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or 'a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding'.

This court "must presume that the state court's factual findings are correct unless the

petitioner rebuts those facts by clear and convincing evidence," and this court "cannot disturb the

state court's ruling simply because it is incorrect; it must also be unreasonable." *Nicolas*, 820 F.3d

at 129; *see also Harrington v. Richter*, 562 U.S. 86, 100-01 (2011); 28 U.S.C. § 2254(e)(1).

"Where the state court conducted an evidentiary hearing and explained its reasoning with some

care, it should be particularly difficult to establish clear and convincing evidence of error on the

state court's part." *Sharpe v. Bell,* 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where

the state court has "resolved issues like witness credibility, which are 'factual determinations' for

purposes of Section 2254(e)(1)." *Id.*

For a state court's decision to be contrary to established federal law, the state court must

have arrived at a conclusion opposite to that reached by the Supreme Court on a question of law,

or must have confronted facts that are "materially indistinguishable from a relevant Supreme

Court" case but nevertheless arrived at the opposite result. *Williams v. Taylor*, 529 U.S. 362, 405

(2000); *see Barnes v. Joyner*, 751 F.3d 229, 238 (4th Cir. 2014); *Lovitt v. True*, 403 F.3d 171, 178

(4th Cir. 2005). Notably, a federal court "may not issue the writ simply because [the court]

concludes in its independent judgment that the relevant state-court decision applied established

federal law erroneously or incorrectly." *Lovitt*, 403 F.3d at 178 (quoting *Williams*, 529 U.S. at 411). Rather, the state court's application of federal law must be unreasonable, not merely incorrect. *Id.*; *see Barnes*, 751 F.3d at 238-39 (state court's decision is an unreasonable application of clearly established federal law when the state court identifies the correct governing principle but unreasonably applies that principle to the facts).

Under section 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal court may not conclude that the state court decision was based on an unreasonable determination of the facts. *Id.* This standard was "meant to be" one that is "difficult to meet . . . ." *Richter*, 562 U.S. at 102.

## II. Discussion

### A. Sufficiency of the Evidence

Pevia argues that the trial court erred in convicting him; the Maryland Court of Special Appeals erred in upholding his convictions; and the State post-conviction court also erred. He maintains that the evidence was insufficient to sustain the convictions. In his view, his convictions were based "solely on circumstantial evidence." ECF 1 at 18-19.

According to Pevia, the evidence at trial supported "two different theories" and when there are "multiple possibilities . . . its [sic] impossible to specifically determine which one is 100% truth." *Id.* at 18-19, 22. Although Pevia acknowledges Dr. Alexander's testimony that it was unlikely Ky'leigh sustained her injuries in the preceding 12 hours (*id.* at 14), and that Ky'leigh's "level of consciousness changed" while in Pevia's care (*id.* at 17), Pevia maintains that his

conviction was unsupported because the trial judge improperly credited the testimony of the State's witnesses, (*id.* at 15).

Respondents urge the Court to deny Pevia's request for federal habeas relief on this basis. *See* ECF 8. As to Pevia's claim that the evidence was insufficient, Respondents assert that the Court of Special Appeals correctly concluded that the trial court's verdict was unassailable. *Id.* at 22. And, they maintain that the Court of Special Appeals' determination was a reasonable application of federal law. *Id.*

On direct appeal, the Court of Special Appeals rejected Pevia's claim that the evidence was legally insufficient to sustain the verdicts. As the State puts it, ECF 8 at 20, that "ruling survives scrutiny" under 28 U.S.C. § 2254(d), for the reasons thoroughly presented by the State appellate court. *See* ECF 8-11.

The standard of review for a sufficiency of the evidence claim on habeas corpus is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could find essential elements of crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This court must consider circumstantial as well as direct evidence and allow the government the benefit of all reasonable inferences from the facts proven to the facts sought to be established. *United States v. Tresvant*, 677 F.2d 1018 (4th Cir. 1982). And, the determination of the credibility of each witness is within the sole province of the fact finder. *United States v. Saunders*, 886 F.2d 56 (4th Cir. 1989); *Pigford v. United States*, 518 F.2d 831 (4th Cir. 1975).

"In assessing a state prisoner's habeas claims, we look to 'the last reasoned decision of a state court addressing the claim.'" *Lawlor v. Zook*, 909 F.3d 614, 626 (4th Cir. 2018) (quoting *Woodfolk v. Maynard*, 857 F.3d 531, 544 (4th Cir. 2017) (internal quotation marks omitted)). In

this case, Pevia presented his sufficiency claim to the Maryland Court of Special Appeals. That court rejected the claim, stating as follows, ECF 8-11 at 8-13:

> Appellant argues that we must reverse his convictions because the evidence was insufficient to establish his criminal agency. The main thread running through the three reasons he posits to support his argument is that the evidence did not show that Ky'leigh's fatal injuries occurred while she was in his custody and care. Appellant's arguments, which we shall address in turn, are meritless.
>
> The standard for appellate review of evidentiary sufficiency "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). "That standard applies to all criminal cases, regardless of whether the conviction rests upon direct evidence, a mixture of direct and circumstantial, or circumstantial evidence alone." *Smith v. State*, 415 Md. 174, 185 (2010) (citation omitted). "[W]hen evaluating the sufficiency of the evidence in a non-jury trial, the judgment of the trial court will not be set aside on the evidence unless clearly erroneous[.]" *State v. Raines*, 326 Md. 582, 589, *cert. denied*, 506 U.S. 945 (1992). *See also Khalifa v. State*, 382 Md. 400, 418 (2004); Md. Rule 8-131(c). This is because we accord deference to the factual findings of the trial judge and give due deference to his ability to observe the demeanor of the witnesses and to assess their credibility. *Wiggins v. State*, 324 Md. 551, 567 (1991), *cert. denied*, 503 U.S. 1007 (1992); *Bryant v. State*, 142 Md. App. 604, 622, *cert. denied*, 369 Md. 179 (2002).
>
> Circumstantial evidence will sustain a conviction when all the facts taken together do not require the fact-finder to resort to speculation or mere conjecture. *Smith*, 415 Md. at 185 (citing *Taylor v. State*, 346 Md. 452, 458 (1997)). Although several cases have recited the litany that "a conviction upon circumstantial evidence alone is not to be sustained unless the circumstances, taken together, are inconsistent with any reasonable hypothesis of innocence[.]" *Wilson v. State*, 319 Md. 530, 537 (1990); *West v. State*, 312 Md. 197, 211-12 (1988), the Court of Appeals has explained:
>
>> [c]ircumstantial evidence is not like a chain which falls when its weakest link is broken, but is like a cable. The strength of the cable . . . does not depend upon one strand, but is made up of a union and combination of the strength of all its strands. No one wire in the cable that supports the suspension bridge across Niagara Falls could stand much weight, but when these different strands are all combined together, they support a structure which is capable of sustaining the weight of the heaviest engines and trains. We therefore think it is erroneous to speak of circumstantial evidence as depending on links, for the truth is that in cases of circumstantial

evidence each fact relied upon is simply considered as one of the strands and all of the facts relied upon should be treated as a cable.

*Hebron v. State*, 331 Md. 219, 227-28 (1993) (quotation marks and citations omitted). "Where it is reasonable for a trier of fact to make an inference, we must let them do so, as the question is not whether the [trier of fact] could have made other inferences from the evidence or even refused to draw any inference, but whether the inference [it] did make was supported by the evidence." *State v. Suddith*, 379 Md. 425, 447 (2004) (quotation marks and citation omitted) (brackets in original).

It is long settled that "[w]eighing the credibility of witnesses and resolving any conflicts in the evidence are tasks proper for the fact finder." *State v. Stanley*, 351 Md. 733, 750 (1998) (citing *Binnie v. State*, 321 Md. 572, 580 (1991)). A fact-finder is free to believe part of a witness's testimony, disbelieve other parts of a witness's testimony, or to completely discount a witness's testimony. *Longshore v. State*, 399 Md. 486, 499-500 (2007) (citations omitted). Accordingly, contradictions in testimony go to the weight of the testimony and credibility of the evidence, rather than its sufficiency, and we do not weigh the evidence or judge the credibility of the witnesses, as that is the responsibility of the trier of fact. *Stanley*, 351 Md. at 750 (citing *Binnie*, 321 Md. at 580). *See also Longshore*, 399 Md. at 499-500.

Appellant first argues that the trial court's finding that he alone was caring for Ky'leigh when she was fatally injured was erroneous because the finding was inconsistent with Dr. Alexander's testimony that the fatal injuries could have been inflicted up to 12 hours before her death. Appellant's argument is meritless and ignores the standard by which we review lower court findings of facts on appeal, *i.e.*, in the light most favorable to the prevailing party, the State. Appellant's argument also ignores the import of Dr. Alexander's testimony, as well as the testimony of the other witnesses who observed Ky'leigh in the 12 hours preceding the 911 call.

Although Dr. Alexander testified that the rapidly life threatening injuries (the torn spleen and liver, rib and skull fractures) could have been inflicted "maybe" 12 hours before her death, he testified that it was "more likely" that the injuries were inflicted within minutes to an hour or so. Moreover, he testified that the life threatening injuries would have brought about an "immediate" change in Ky'leigh's behavior, making it difficult for her to breathe, causing lethargy, and leading to loss of consciousness. The evidence showed that it was during appellant's care that Ky'leigh's condition rapidly changed. Angela testified that Ky'leigh had slept well the previous night and there was no testimony regarding any abnormal behavior by Ky'leigh during the night preceding her death or the morning of her death. Dakota testified that in the morning Ky'leigh was sitting on the bed and "[s]he was fine." Ky'leigh was smiling and watching Harris play hand puppets with her. Angela likewise testified that when she returned home, she found

Ky'leigh on Dakota's bed, smiling. At 12:30 p.m. appellant came upstairs and took Ky'leigh downstairs. At 2:15, appellant brought Ky'leigh back to Dakota and said something was wrong with her— she was limp, not moving, breathing heavily, and her eyes were barely open. Accordingly, there was ample evidence that the fatal injuries were inflicted between 12:30 p.m. and 2:15 p.m. while Ky'leigh was in appellant's sole care.

Appellant's second argument is that the trial court's finding that Ky'leigh was in his care alone when the injuries were inflicted was erroneous because it rested solely on the testimony of Dakota, whose testimony the trial court erred in crediting. Appellant directs our attention to Dakota's testimony that she told a female officer at the hospital, whose name she could not recall, that appellant was trying to leave. Appellant then directs our attention to the testimony of Trooper Shana O'Neal of the Maryland State Police, who testified that appellant was cooperative at the hospital and did not try to run away. There are several simple answers to appellant's argument. First, it is possible that there were two female officers at the hospital and so there was no inconsistency between Dakota's and Trooper O'Neal's testimony. Second, even if there was an inconsistency, we pay great deference to the trial court's assessment of credibility and proper resolution of conflicts in evidence. Third, appellant's criminal agency did not rest solely on Dakota's testimony—appellant himself admitted to two witnesses at the hospital that he was alone with Ky'leigh when she began to act abnormally.

Finally, appellant argues that the trial court finding that Ky'leigh was in his care when the fatal injuries were inflicted was based upon the erroneous finding that "[a] child with this set of injuries likely could not have s[a]t up or obviously stand. The pain would have limited such actions." Appellant argues that this was inconsistent with Dr. Alexander's testimony that it was "possible" for Ky'leigh to sit up or stand up in her walker with her injuries. According to appellant, because it was "possible" for Ky'leigh to sit or stand up with her fatal injuries, it was possible that those injuries could have occurred before his care. Again, appellant reads the testimony of Dr. Alexander too selectively, missing its main thrust. The trial court's finding that Ky'leigh "likely could not have s[a]t up or obviously stand" with her injuries was entirely consistent with Dr. Alexander's testimony that while it was "possible that Ky'leigh could have stood or sat up, it was probably more likely that she would not have moved because . . . it would have been painful to move."

For the reasons set out above, we shall affirm the trial court's judgments.

The Court of Special Appeals' decision was not based on an unreasonable determination of the facts in light of the evidence presented in Pevia's trial. As Pevia acknowledges, Dr. Alexander testified that although he believed it was possible, he did not "think it is really likely"

that Ky'leigh sustained her fatal injuries in the 12-hour period preceding her time alone with Pevia. ECF 8-3 at 39; ECF 1 at 14. Respondents correctly point out that the testimony of Dr. Alexander, together with the witnesses who observed Ky'leigh in the 12 hours preceding the 9-1-1 call at 2:15 p.m., provided an ample foundation for the trial court's finding that Pevia was alone with Ky'leigh when she became limp and unresponsive. Based upon Ky'leigh's normal behavior while she was with Dakota, the trial court fairly concluded that Ky'leigh began to lapse into unconsciousness within minutes of the infliction of the fatal blows, during which time she was in the sole custody of Pevia.

With regard to Pevia's contention that the evidence supported "multiple possibilities," the Court of Special Appeals properly noted that "'[w]here it is reasonable for a trier of fact to make an inference, we must let them do so, as the question is not whether the [trier of fact] could have made other inferences from the evidence or even refused to draw any inference, but whether the inference [it] did make was supported by the evidence.'" ECF 8-11 at 10 (quoting *State v. Suddith*, 379 Md. 425, 447 (2004)). As previously stated, the inference made by the trial court in Pevia's case was supported by the evidence. And, "even if reasonable minds reviewing the record might disagree about the finding in question," this court may not conclude that the State court's decision was based on an unreasonable determination of the facts. *Wood*, 558 U.S. at 301.

And, to the extent that there were any conflicts in the evidence, the trial court properly resolved them. As the Court of Special Appeals explained, "'[w]eighing the credibility of witnesses and resolving any conflicts in the evidence are tasks proper for the fact finder'" and "contradictions in testimony go to the weight of the testimony and credibility of the evidence, rather than its sufficiency." ECF 8-11 at 10-11 (citing *Stanley*, 351 Md. at 750). Because the trial court had an evidentiary basis for finding that Ky'leigh's injuries were inflicted between 12:30

and 2:15 p.m., when Ky'leigh was in Pevia's sole custody, its finding was not clearly erroneous. Accordingly, Pevia has not set forth a basis for relief under 28 U.S.C. § 2254(d).

In sum, the evidence at trial was quite substantial, and not insufficient. "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Borgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc); *see also Untied States v. Rodriguez-Soriano*, ___ F.3d ___, 2019 WL 3308546, at *2 (4th Cir. July 24, 2019); *United States v. Kasai*, 736 F. App'x 414, 415 (4th Cir. 2018); *United States v. Cowden*, 882 F.3d 464, 474 (4th Cir. 2018).

## B.  Ineffective Assistance of Counsel

In his Petition, Pevia claims that defense counsel was ineffective for failing "to submit evidence at trial, alert [the trial judge] of Mr. Harris [sic] perjured testimony, properly cross examin[e] Angela Mabe of perjured testimony" and adequately inform the trial judge "to comply with Md. Rule 4-246." ECF 1 at 19.

With regard to Pevia's contention that he received ineffective assistance of counsel, Respondents contend that only two of those claims were exhausted in State post-conviction proceedings; because the rest of the claims were not exhausted, they are now procedurally defaulted. ECF 8 at 22-23. As to the exhausted claims regarding trial counsel's alleged failure to exclude prior "bad acts" evidence and failure to challenge the trial court's noncompliance with Maryland Rule 4-246, Respondents argue that counsel was not deficient and the post-conviction court properly rejected Pevia's claims.

I shall review the legal standard and then address each of Pevia's claims, in turn.

*1.  The Standard for Ineffective Assistance*

The Sixth Amendment to the Constitution guarantees a criminal defendant the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see also Buck v. Davis*, ____ U.S. ____, 137 S. Ct. 759, 775 (2017); *United States v. Morris*, 917 F.3d 818, 823 (4th Cir. 2019). Ineffective assistance of counsel is a well recognized basis for post-conviction relief. *See generally Missouri v. Frye*, 566 U.S. 133 (2012); *Lafler v. Cooper*, 566 U.S. 156 (2012); *Padilla v. Kentucky*, 559 U.S. 356 (2010).

To mount a successful challenge based on a Sixth Amendment claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged test set forth in *Strickland*, 466 U.S. at 687–88. *See Williams v. Taylor*, 529 U.S. 362, 390 (2000); *United States v. Winbush*, 922 F.3d 227, 229 (4th Cir. 2019); *United States v. Carthorne*, 878 F.3d 458, 465 (4th Cir. 2017); *United States v. Powell*, 850 F.3d 145, 149 (4th Cir. 2017). First, the petitioner must show that counsel's performance was deficient. Second, the petitioner must show that he was prejudiced by the deficient performance. *Strickland*, 466 U.S. at 687; *see Buck*, 137 S. Ct. at 775; *Chaidez v. United States*, 568 U.S. 342, 348 (2013); *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000); *Hill v. Lockhart*, 474 U.S. 52, 57 (1985); *Winbush*, 922 F.3d at 229; *Powell*, 850 F.3d at 149; *United States v. Rangel*, 781 F.3d 736, 742 (4th Cir. 2015); *United States v. Dyess*, 730 F.3d 354, 361 (4th Cir. 2013); *Richardson v. Branker*, 668 F.3d 128, 139 (4th Cir. 2012); *United States v. Higgs*, 663 F.3d 726, 735 (4th Cir. 2011); *see, e.g., United States v. Baker*, 719 F.3d 313, 318 (4th Cir. 2013).

The first prong is known as the "performance prong," which relates to professional competence. The petitioner must demonstrate that his attorney's performance fell "below an objective standard of reasonableness," as measured by "prevailing professional norms." *Strickland,* 466 U.S. at 688; *see Harrington v. Richter*, 562 U.S. 86, 104 (2011); *Powell*, 850 F.3d at 149. The central question is whether "an attorney's representation amounted to incompetence

under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 690).

The Supreme Court recently reiterated that the "first prong sets a high bar." *Buck*, 137 S. Ct. at 775; *see also Powell*, 850 F.3d at 149. In *Padilla*, the Court said, 559 U.S. at 371: "Surmounting *Strickland's* high bar is never an easy task." Notably, a "lawyer has discharged his constitutional responsibility so long as his decisions fall within the 'wide range of professionally competent assistance.'" *Buck*, 137 S.Ct. at 775 (citation omitted). Consequently, the performance prong is "'difficult'" to establish. *Lawrence v. Branker*, 517 F.3d 700, 709 (4th Cir. 2008) (quoting *James v. Harrison*, 389 F.3d 450, 457 (4th Cir. 2004)).

To satisfy the high bar, the burden is on the petitioner to establish "'that counsel made errors so serious that his "counsel" was not functioning as the "counsel" guaranteed by the Sixth Amendment.'" *Richter*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 687). Notably, "the *Strickland* standard must be applied with scrupulous care," *Richter*, 562 U.S. at 105, and "the standard of judging counsel's representation is a most deferential one." *Id.* Indeed, "[k]eenly aware of the difficulties inherent in evaluating counsel's performance, the Supreme Court has admonished that courts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Lawrence*, 517 F.3d at 708 (quoting *Strickland,* 446 U.S. at 689); *see Cullen v. Pinholster*, 563 U.S. 170, 189 (2011); *Richter*, 562 U.S. at 104; *Lee v. Clarke*, 781 F.3d 114, 122 (4th Cir. 2015).

Second, the petitioner must show that his attorney's deficient performance "prejudiced [his] defense." *Strickland*, 466 U.S. at 687. To satisfy the "prejudice prong," a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *see also Buck*, 137 S. Ct. at 776; *Lafler*, 566

U.S. at 163; *Lockhart v. Fretwell*, 506 U.S. 364, 369-70 (1993). "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceedings. *Strickland*, 466 U.S. at 687. However, a petitioner is not entitled to post-conviction relief based on prejudice where the record establishes that it is "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

A court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697. Nor must a court address both components if one is dispositive. *Jones v. Clarke*, 783 F.3d 987, 991 (4th Cir. 2015). This is because failure to satisfy either prong is fatal to a petitioner's claim. As a result, "there is no reason for a court...to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

### 2. *Exhaustion and Procedural Default*

Although Pevia presented several claims of ineffective assistance of counsel in State post-conviction proceedings in the Circuit Court (ECF 8-13; ECF 8-14), he presented only two in his application to the Court of Special Appeals for leave to appeal: that trial counsel was ineffective for (1) failing to exclude prior "bad acts" evidence and (2) failing to challenge the trial court's noncompliance with Maryland Rule 4-246. ECF 8-16. To the extent Pevia is now attempting to reassert claims of ineffective assistance of counsel beyond those two contentions, such claims are unexhausted and are procedurally defaulted.

As explained, *supra*, the exhaustion requirement is satisfied by "giv[ing] the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 845. To exhaust a claim

through post-conviction proceedings, it must be raised in a petition filed in the Circuit Court and in an application for leave to appeal to the Court of Special Appeals. *See* C.P. § 7-109. Although Pevia raised numerous claims of ineffective assistance of counsel in his post-conviction petition filed in the Circuit Court, he presented only two of them in his application for leave to appeal. Therefore, he satisfied the exhaustion requirement only as to the two claims mentioned above.

The unexhausted claims are procedurally defaulted, as Pevia failed to present them in his application for leave to appeal and the state courts would now find that he cannot assert those claims. *See Mickens v. Taylor*, 240 F.3d 348, 356 (4th Cir. 2001); *accord Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998) (stating that a procedural default occurs when a habeas petitioner fails to exhaust available State remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred (citation omitted)).

Accordingly, I shall proceed to address only the claims that have been exhausted and not procedurally defaulted.

### 3. Merits

As indicated, claims for relief premised on ineffective assistance of counsel are assessed under *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny. To prevail, the petitioner must demonstrate both that his counsel's performance was deficient, and that the deficient performance prejudiced his defense. *Id.* at 687. A strong presumption of adequacy attaches to counsel's conduct such that a petitioner alleging ineffective assistance must show that the proceeding was rendered fundamentally unfair due to his counsel's errors. *Id.* at 689, 700. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting

effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

In the context of a *Strickland* claim previously litigated in state court and then raised in a federal habeas petition, a petitioner must also show that the state court's determination was contrary to or involved an unreasonable application of clearly established federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence. 28 U.S.C. § 2254(d). "State court findings of fact made in the course of deciding an ineffectiveness claim" are presumptively correct. *Strickland*, 446 U.S. at 698; *see also* 28 U.S.C. § 2254(e)(1). The petitioner must rebut this presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

In rejecting Pevia's claim that his attorney failed to object to prior bad acts evidence, the post-conviction court stated, ECF 8-15 at 9-11:

> Several pieces of testimony showed that the child victim was abused prior to the day of the incident. This included testimony from the child's pediatrician who referred the family to test for shaking baby syndrome, testimony that the child fell off the bed several times, testimony that the child had prior injuries to her ribs and that some were in the process of healing, and testimony that the child had an injury to her shoulder or side.

> Petitioner argues that this evidence was irrelevant, but that the State nonetheless used it to show that the Petitioner previously abused the child, had a propensity to do so, and therefore was the most likely candidate to have caused the child's death, which is inadmissible under Maryland Rule 5-404. Evidence of prior bad acts maybe admissible to show something other than propensity, but must pass the *Faulkner* test. *State v. Faulkner*, 314 Md. 630 (1989) (holding that to be admissible the other bad act must be (a) probative of another issue, (b) proven by clear and convincing evidence, and (c) more probative than prejudicial).

> Petitioner argues that evidence of the prior injuries to the child did not pass this test because it did not fall under an exception, there was no evidence that the Petitioner committed these acts, and it was prejudicial to the defense without being probative to the ultimate issue of the case. Petitioner contends that his trial counsel made a serious error in failing to object to this evidence, and that it was prejudicial.

He argues that the judge, as fact-finder, could not help but consider this propensity evidence.

It is a debatable legal argument as to whether or not the evidence would have been admissible in this case. The State pointed to *Taylor* to suggest that reoccurring child abuse cases may use prior abuse to show absence of mistake, malice, and intent. *Taylor v. State*, 347 Md. 363 (1997). Defense correctly points out that the case differs from Petitioner[']s because identity, and not intent, were the issue in the instant trial; however, *Taylor* supported the use of this evidence without the issue of intent being directly raised through testimony. *Id.* at 374-375. The evidence may have been admissible in Petitioner's case even over an objection by trial counsel.

The State also points out that Petitioner had a bench trial, and the presumption is that when a Judge is the trier of fact he has the ability to parse out improper evidence and to follow the rules of evidence. *Graves v. State*, 298 Md. 542, 548 (1984) (in bench trials one may determine from the trial court's statement of its grounds for its decision whether trier of fact was affected by improper evidence).

Failure to object to this evidence does not amount to serious attorney error, as it may have been admissible. Further, there was [no] prejudice to the Defendant because the Judge as trier of fact did not use propensity evidence in determining whether the Defendant committed this crime.[8]

With regard to counsel's failure to object to the "prior bad acts" evidence, Pevia did not show that counsel's trial strategy was unreasonable. As Respondents point out, the status of the victim's health at the time of death was a relevant fact, not evidence of a prior bad act. Pevia has not shown how the State used this evidence in violation of Maryland Rule 5-404. Neither has he shown that the State would not have met the admissibility requirements had a Rule 5-404 objection been made by counsel. More important, there is no proof that this evidence contributed to the trial court's verdict. In the absence of proof of deficient conduct or prejudice, it was, under *Strickland*, reasonable for the post-conviction court to reject Pevia's claim.

---

[8] In context and in light of the court's disposition, it is clear that the omission of the word "no" was a typographical error.

Pevia's other claim is predicated on Maryland Rule 4-246(b). It governs the trial court's procedure for accepting a criminal defendant's waiver of his right to trial by jury. The rule provides:

> A defendant may waive the right to a trial by jury at any time before the commencement of trial. The court may not accept the waiver until, after an examination of the defendant on the record in open court conducted by the court, the State's Attorney, the attorney for the defendant, or any combination thereof, the court determines and announces on the record that the waiver is made knowingly and voluntarily.

Pevia contends that his counsel was ineffective for failing to object to the trial court's noncompliance with Maryland Rule 4-246. The post-conviction court stated, ECF 8-15 at 14:

> Petitioner argued that his trial attorney should have known to object at trial. Additionally, his appellate counsel should have raised [the] *Valonis* issue on appeal as it would been a strong argument.

> The State pointed out that at trial Petitioner was properly advised of his right to a trial by jury. As a matter of timing, his attorney would not have known to object to the Judge's failure to make an affirmative finding on the record.

> As for appellate counsel, it would not have been unreasonable to assume the issue had been waived for a failure to object at trial. Additionally, although the rule change that had led to *Valonis* [*v.* State, 431 Md. 551, 66 A.3d 661 (2013)] had been in place, *Valonis* itself changed how the requirements of the rule were interpreted. *Valonis* was not decided until 2013. Petitioner's appellate brief was submitted in 2012, and counsel would be hard pressed to predict such an issue would be meritorious.

> The inability of trial counsel and appellate counsel to take advantage of the issue does not fall below the standard of a reasonable counsel. Both focused their efforts on the issues they thought would be most successful for Petitioner, exercising reasonable strategy.

The post-conviction court's rulings regarding Pevia's ineffective assistance of counsel claims withstand scrutiny under 28 U.S.C. § 2254(d). At a minimum, Pevia has failed to show that his attorney's performance was deficient. Moreover, both of his claims turn entirely on the post-conviction court's application of Maryland law, and the court's conclusion that trial counsel

acted reasonably under prevailing Maryland law at the time of Pevia's trial forecloses relief. *See Estelle*, 502 U.S. at 67-75 (confirming that federal habeas relief is not available for errors of state law, and that it is not the province of a habeas corpus court to reexamine a state court's acknowledgment of a state law issue).

Maryland Rule 4-246(b) was amended in 2008 to make clear that the trial court must expressly find on the record at a hearing that a defendant's waiver is knowing and voluntary. *See Valonis v. State*, 431 Md. 551, 562, 66 A.3d 661, 667 (2013). In *Valonis*, decided on May 20, 2013, *i.e.,* after Pevia was sentenced, the Maryland Court of Appeals recognized that the amendment to the Rule "ensures that an explicit determination is made and enhances our review of what actually transpired in the trial court. In turn, the reviewing process will become more streamlined and efficient." *Id.* at 565, 66 A.3d at 669. Because a defendant maintains a constitutional right to be tried by a jury, the amendment was intended to "provide[] further safeguards to ensure that the decision is in actuality the defendant's own knowing, voluntary, and personal choice." *Id.* at 563, 66 A.3d at 668. Consequently, the *Valonis* Court vacated the conviction and remanded for a new trial, without reaching whether contemporaneous objection at the waiver hearing was required to preserve the issue for appellate review.

In ruling on Pevia's post-conviction petition, the State court concluded that because the Court of Appeals of Maryland had not yet made clear that counsel was required to object contemporaneously at the time of the waiver hearing, counsel was not ineffective. ECF 8-15 at 14. The post-conviction court was not unreasonable in stating that counsel cannot be found ineffective for failing to adhere to a requirement that did not exist at that time. Indeed, in *Nalls v. State*, 437 Md. 674, 89 A.3d 1126 (2014), the Maryland Court of Appeals announced that, "[g]oing

forward," failure to object contemporaneously to the trial court's lack of findings under Rule 4-246(b) will result in the defendant having waived the issue for future review.

The post-conviction court's conclusion that counsel acted reasonably under prevailing State law at the time of Pevia's trial forecloses relief on this claim. *See Estelle*, 502 U.S. at 67-68 (inquiry as to whether state court erred under state law "is no part of a federal court's habeas review of a state conviction"; federal court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States"). Moreover, the post-conviction court's reasoning is not contrary to or an unreasonable application of clearly established federal law. *See* 28 U.S.C. § 2254(d).

Claims under *Strickland's* performance prong are "evaluated in light of the available authority at the time of counsel's allegedly deficient performance." *Carthorne*, 878 F.3d at 466. "A lawyer does not perform deficiently by failing to raise novel arguments that are unsupported by then-existing precedent." *Morris*, 917 F.3d at 823; *see United States v. Mason*, 774 F.3d 824, 830 (4th Cir. 2014) ("We have consistently made clear that we do not penalize attorneys for failing to bring novel or long-shot contentions."). As the Court said in *Morris*, 917 F.3d at 823, counsel does not fall below *Strickland's* standard of reasonableness "by failing to anticipate changes in the law, or to argue for an extension of precedent. *See*, *e.g.*, *United States v. Dyess*, 730 F.3d 354, 363 (4th Cir. 2013); *Honeycutt v. Mahoney*, 698 F.2d 213, 217 (4th Cir. 1983)."

To be sure, it is now clear that a contemporaneous objection must be lodged to preserve a claim concerning a trial judge's failure to make an express finding of waiver of the right to a jury trial. But, Pevia's counsel was not ineffective for failing to raise an objection that was not clearly required at the time. *See Kornahrens v. Evatt*, 66 F.3d 1350, 1360 (4th Cir. 1995); *accord Lenz v. Washington*, 444 F.3d 295, 307 (4th Cir. 2006) (stating that "the case law is clear that an attorney's

assistance is not rendered ineffective because he failed to anticipate a new rule of law"). Pevia is not entitled to habeas relief on this ground.

### C. Maryland Rule 4-246(b)

In his Motion to Supplement and Amend, Pevia argues that the trial court erred in failing to comply with Rule 4-246(b), because it failed to determine that his waiver of a jury trial was made knowingly and voluntarily. ECF 15. Pevia waived the right to challenge this error because he failed to object at the time; thus, procedural default on this basis applies here. *See Nalls*, 437 Md. at 685-90, 89 A.2d at 685-691. Even if Pevia's procedural default were excused, however, the claim itself fails to present a question of federal or constitutional law sufficient to justify habeas relief.

Construed most favorably to Pevia, his claim is a challenge to the sufficiency of the Rule 4-426 colloquy. However, the rule violation itself does not automatically entitle petitioner to habeas relief. He must also demonstrate that the state rule violation infringes upon a specific constitutional right that amounts to a "fundamental defect which inherently results in a complete miscarriage of justice." *Hailey v. Dorsey*, 580 F.2d 112, 115 (4th Cir. 1978) (internal marks and citation omitted); *Sumrall v. Simms,* 230 F.3d 1354, 2000 WL 1283077, at *1 (2000) (4th Cir. 2000) (per curiam).

At most, Pevia's assertion is that the trial court's failure to follow Rule 4-246(b) infringed on his due process rights. *See* ECF 15. He is mistaken. Rule 4-246(b) is a procedural rule designed to aid the appellate courts in reviewing the sufficiency of jury trial waivers. *Nalls*, 437 Md. at 688; *Valonis*, 431 Md. at 565. It sets out the procedure for memorializing the waiver, but does not itself vest Pevia with an independent constitutional right stemming from having his waiver

memorialized in a particular way. Therefore, I cannot conclude that the trial court's alleged lack of compliance with Rule 4-246(b) alone amounts to a violation of a constitutional right.

Under both federal and Maryland law, a waiver of jury trial right must be voluntarily, knowingly, and intelligently made. *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *see also Brady v. United States*, 397 U.S. 742, 748 (1970); *United States v. Boynes*, 515 F.3d 284, 286 (4th Cir. 2008) ("The constitutional imperative is this, no less and no more: the waiver must be knowing, intelligent, and voluntary."). Indeed, the Maryland jury trial waiver procedure is more exacting than the federal requirement. *See* Md. Rule 4-246(b); *Boynes*, 515 F.3d at 286.

Pevia's right to be tried by a jury implicates the Sixth and Fourteenth Amendments of the United States Constitution. *See Field v. Sheriff of Wake Cty.*, N.C., 831 F.2d 530 (4th Cir. 1987). But, Pevia "may knowingly and voluntarily waive many of the most fundamental protections afforded by the Constitution, including . . . the right to a jury trial." *United States v. Jennings*, 323 F.3d 263, 275 (4th Cir. 2003) (internal marks and citations omitted), so long as the waiver is knowing and voluntary. *Id.* at 275-76. Pevia was advised on the record by his attorney of his right to be tried by a jury and all of the concomitant rights. ECF 8-2 at 5-7. Further, he was told that trial before the judge would essentially replace the 12 jurors with the judge alone as finder of fact. *Id.* Pevia was then expressly asked whether it was his intention to waive the right to a jury and he responded "yes." *Id.*

The record in this case does not support that Pevia's waiver itself was constitutionally defective. *See United States v. Boynes*, 515 F.3d 284, 286 (4th Cir. 2008) ("Although we reiterate our view that it is much preferable for a district court to insure itself on the record before accepting the defendant's jury waiver, it is not a constitutional imperative."). Indeed, given the inflammatory nature of the allegations, in which Pevia was accused of the murder of an eight-month-old child,

it was clearly a matter of trial strategy to proceed before a judge, who was arguably less likely to be influenced or swayed by the horrific nature of the crime. Pevia's claim fails.

### D. Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Because the accompanying Order is a final order adverse to the applicant, 28 U.S.C. § 2253(c)(1) requires issuance of a certificate of appealability before an appeal can proceed.

A certificate of appealability may issue if the prisoner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a district court rejects constitutional claims on the merits, a petitioner may satisfy the standard by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When a petition is denied on procedural grounds, the petitioner may meet the standard by showing that reasonable jurists "would find it debatable whether the petition states a valid claim of the denial of a constitutional right" and "whether the district court was correct in its procedural ruling." *Id.*

Pevia has failed to satisfy this standard on any of his claims. Therefore, a certificate of appealability shall not issue.

### E. Conclusion

For the foregoing reasons, the court will grant Pevia's Motion to Supplement and Amend Complaint, deny his Petition for Writ of Habeas Corpus, and decline to issue a certificate of appealability. A separate Order follows.


July 26, 2019                                       /s/
Date                                        Ellen L. Hollander

United States District Judge